**Douglas W. STREBEL, Appellant,**

v.

**John C. WIMBERLY II, Appellee.**

**No. 01–10–00227–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 12, 2012.

Rehearing Overruled May 1, 2012.

Brett Kutnick, Jeffrey S. Levinger, Hankinson Levinger LLP, Ernest E. Figari Jr., Lance Vernon Clack, Figari & Davenport, L.L.P., Dallas, TX, for Appellant.

Matthew L. Hoeg, W. Earl Touchstone, Andrews & Kurth, L.L.P., Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices BLAND and HUDDLE.

## OPINION

SHERRY RADACK, Chief Justice.

This is an appeal from a judgment following a jury trial. Plaintiff John Wimberly sued defendant Douglas Strebel to recover profit distributions from their business ventures that Wimberly alleges Strebel wrongfully withheld. The trial court entered judgment on the jury's finding that Strebel breached his fiduciary duties to Wimberly and awarded to Wimberly actual damages and attorneys' fees. We reverse the trial court's judgment on Wimberly's breach of fiduciary duty claims because we conclude that the parties contractually disclaimed the fiduciary duties related to profit distributions to Wimberly. We remand to the trial court for consideration of the jury's alternative liability and damages findings on Wimberly's minority oppression claims and for reconsideration of its attorneys' fees award in light of our opinion.

## BACKGROUND

Plaintiff Wimberly has extensive background and expertise in corporate tax compliance and planning. He met, and became close friends with, defendant Strebel while working at Shell Oil Company. Wimberly worked in the Research and Planning division developing structured

transactions. Strebel began in Shell's tax department and later moved on to mergers and acquisitions, eventually leaving Shell to go into investment banking.

### A. Black River Capital, LLC (f/k/a Longhorn Trade, LLC)

In February 2003, Wimberly and Strebel went into business together. They formed—under Delaware law—Longhorn Trade, LLC as 50/50 members to provide advisory tax services to third parties. In its first year, the company handled only 3 or 4 small deals, and no funds were distributed to members. In February of 2004, the name of Longhorn Trade was changed to Black River Capital, LLC (Black River LLC).

### B. The TXU Engagement and 2004 Profit Distributions

Around the time Longhorn Trade was formed, Strebel began talks with John Wilder, an old friend who had recently become the CEO of TXU Energy, about potentially doing some work for TXU. The resulting contracts became the focus of Wimberly's and Strebel's business ventures, and also the source of the majority of the profits forming the basis of the underlying lawsuit. Given that this work for TXU arose from Strebel's relationship with Wilder, Wimberly and Strebel orally agreed early on to change their profit-sharing percentages to 60% to Strebel and 40% to Wimberly.

Later in 2004, TXU formally engaged Black River LLC under a one-year advisory agreement. Under that agreement, TXU agreed to pay Black River LLC a $208,000 monthly retainer, as well as substantial success fees. During 2004, Wimberly helped TXU structure about 30 transactions under that agreement. This TXU agreement, which accounted for 95% of Black River LLC's revenue, brought over $7 million in advisory fees and over $6.5 million in net profits for 2004. Pursuant to their agreement, $2,610,291 (40%) was allocated to Wimberly in 2004, and $3,915,437 (60%) was allocated to Strebel.

In April 2005, Black River LLC and TXU signed a new, three-year agreement. It mandated that 95% of Wimberly's time and 75% of Strebel's time be devoted to TXU's business and continued to provide for an approximately $208,000 monthly retainer and success fees. It also provided that TXU would pay Black River LLC $3,000,000 if TXU was ever sold.

### C. The 2005 Agreements

As their business grew and they continued work on multiple TXU projects, Wimberly and Strebel began discussing the future direction of their company and negotiating long-term agreements. They also hired two new employees, Alejandro Sole and Federico Brom, and brought in a friend of Strebel's, Eric Manley, to develop new business.

In December 2005, Wimberly and Strebel executed several documents that altered their entity structure to (1) memorialize some changed and additional agreed-upon terms, (2) provide additional specifics about business purpose, management, and operations, (3) comply with certain federal securities regulations, and (4) minimize Texas franchise tax liability.

#### 1. The Amended Black River LLC Agreement

First, on December 8, 2005, Wimberly, Strebel, and their respective wives, Donna Wimberly (Donna) and Lee Strebel (Lee), executed an Amended and Restated Limited Liability Company Agreement of Black River Capital, LLC, which provided an effective date of almost two years earlier— January 1, 2004.

### a. Members and Managers

That agreement, among other things, designated:

- Strebel and Wimberly as the Members with sharing ratios of 60% and 40% respectively in the LLC's profits,
- Wimberly, Strebel, Donna, and Lee as Managers of the LLC, collectively the Board of Managers, and
- Strebel as Managing Manager and CEO of the LLC, with broad decisionmaking and management powers.

### b. Strebel's Decision-making Authority

The Amended Black River LLC Agreement prohibited Strebel from making "any Major Decision without Consulting with the Board of Managers." "Major Decisions" include:

- changing any Member's Sharing Ratio,
- requesting additional Capital Contributions, and
- making any Fundamental Changes in the Company.

Also encompassed in the definition of Major Decisions was "causing" Black River LLC to take action in its capacity as a partner, owner, or manager of affiliated entities or a subsidiary that would be a Major Decision at the LLC level. "Consulting with the Board of Managers" means discussion at a meeting with a quorum of Managers after due notice and adequate information is provided. Another consulting requirement under the agreement provides that Wimberly must be fully informed on an ongoing basis about substantive negotiations concerning any Fundamental Change (i.e., merger, acquisition, or other event that would change ownership), or any admission of a new Member that would decrease Wimberly's Sharing Ratio.

Strebel had the power, as Managing Manager, to require Members to make additional Capital Contributions in cash "in such amounts as are necessary to continue the business of the Company." Wimberly's Capital Contributions, however, could not exceed $500,000 per year without his consent.

Strebel's Managing Manager powers were circumscribed by a prohibition on taking eleven specific actions without Wimberly's approval. Under this provision, Strebel could not reduce Wimberly's Sharing Ratio "to a level less than 30% for TXU Business prior to January 1, 2006 or 25% for TXU Business thereafter."

### c. Fiduciary Duties

The Amended Black River LLC Agreement provided that "the Managers shall have fiduciary duties to the Company and the Members equivalent to the fiduciary duties of directors of Delaware corporations." It also contains a provision that the "Members shall have fiduciary duties to the Company comparable to stockholders of Delaware corporations."

## 2. The Black River Capital Partners, LP Agreement

Also on December 8, 2005, Wimberly, Strebel, Lee and Manley executed an Agreement of Limited Partnership of Black River Capital Partners, LP (Black River Capital LP), which formed a new limited partnership as of August 12, 2005.

### a. Members and Powers

Under this agreement, Black River LLC was appointed as the general partner and, with limited exceptions, granted broad and exclusive power and authority to control Black River LP. Wimberly, Strebel, Manley, and Lee became limited partners of Black River LP, agreeing not to take "part

in the management or control ... of the Partnership's business," and, in their capacity as limited partners, have "no right or authority" to act for the LP.

### b. Assets and Profit Sharing

The Black River LP Agreement required Black River LLC, as the general partner, to assign and contribute all of its business assets, including its 2005 TXU contract, to Black River LP. The LP agreement also contained different profit allocation and Sharing Ratios. Lee was guaranteed the first $310,000 of any TXU profits, with the remainder of TXU profits split among: Black River LLC (1%), Strebel (59.37%), Wimberly (34.63%), and Manley (5%). The Sharing Ratio for all other Advisory Business Profits was: Black River LLC (1%), Strebel (4.6%), Wimberly (4.4%), Manley (5%), with the remainder to be allocated individually based on particular client engagement letters and terms. The general partner, Black River LLC, was empowered to change the Sharing Ratio of any partner based on a majority vote of the limited partners, provided no change could reduce Wimberly's share of TXU profits below 30% prior to January 1, 2006, or below 25% thereafter. The general partner could also require mandatory capital contributions from partners, with the caveat that the maximum that Wimberly could be required to contribute in capital to the limited partnership and any of its affiliates was $500,000 per year.

### c. Fiduciary Duties

The Black River LP Agreement provides that "the General Partner shall have no duties (including fiduciary duties) except as expressly set forth in th[e] Agreement." No other provision in the agreement imposes fiduciary duties upon the general partner.

### 3. BRC Securities, LP

On December 8, 2005, the same day that the Amended Black River LLC Agreement and the Black River LP Agreements were signed, Strebel and Wimberly executed documents to form another limited partnership, BRC Securities, LP. The genesis was concern about whether a NASD license was needed for certain business activities, which could be held by this separate entity. Black River LLC was designated as the general partner, and Black River LP was the sole limited partner.

### D. 2005's Profit Distribution

In December 2005, pursuant to the Black River LP Agreement, Black River LLC assigned the TXU contract and its other assets to the Black River LP retroactively, as of August 12, 2005. The LLC's revenue was then split for the year, with $2,111,237 retained by the LLC, and $1,065,769 allocated to Black River LP.

Of Black River LLC's 2005 net income of $1,527,396, Strebel was allocated $916,438 (60%) and Wimberly $610,958 (40%). All of Black River LP's $238,450 net income was distributed to Lee and Manley under the Black River LP agreement, with no positive allocation to Strebel or Wimberly.

### E. 2006 Partnership/Share Ratio Changes and Profit Distributions

On November 9, 2006, Strebel emailed Wimberly that, effective January 1, 2006, Wimberly's Sharing Ratio in TXU work would be reduced to 25%. On September 17, 2007, Strebel—acting as Managing Manager of Black River LLC (the general partner) and as holder of the Majority of the limited partner voting rights—amended the Black River LP Agreement. This amendment, which was made retroactively effective August 1, 2006, made Steve Houle a limited partner. As of January 1, 2006, Houle was allocated a 7.5% Sharing Ratio

in profits from TXU business; Manley's Sharing Ratio was increased from 5% to 7.5%, and Wimberly's Sharing Ratio was reduced from 34.63% to 24.63%.[1]

In 2006, Black River LP generated about $7,300,000 in revenue—all but $110,000 from TXU business. Profits for 2006 were approximately $5,393,233, of which $1,244,673 (23%) was distributed to Wimberly.

### F. *The 2007 Dispute and Wimberly's Departure*

In January 2007, Wimberly complained to Strebel about retroactively reducing his Sharing Ratio, and about him doing so without consulting with the LLC's Board of Managers. When Strebel refused to reconsider, Wimberly hired counsel, who sent a demand letter requesting access to books and records of the Black River Entities and complaining of Strebel's failure to conduct a meeting or consult with the Board of Managers about changes. The relationship quickly deteriorated and, on February 16, 2007, Wimberly and his wife sued Strebel in Galveston County.

On February 21, 2007, Strebel issued a Capital Call, requiring himself to inject $750,000 in cash in the Black River LLC, and requiring Wimberly to inject $500,000 to be immediately contributed to Black River LP. The trial court enjoined Strebel from enforcing the Capital Call against Wimberly or from deeming his interest in Black River LLC tendered for failure to comply with the Capital Call.

Two days later, on February 23, 2007, Wimberly was briefly hospitalized following an episode at the office related to his depression medications. On February 26, 2007, TXU announced it was in negotia-tions with a potential purchaser and, consequently, "shut down permanently" all of the Black River projects Wimberly worked on. While Wimberly continued working on non-TXU business at home, he never returned to Black River's offices.

### G. *The New TXU Agreement*

After the TXU sale was announced, Strebel renegotiated the terms of the engagement with TXU. While the existing agreement between TXU and Black River LLC did not terminate until April 1, 2008, the new agreement—between TXU and Black River Securities, LP and Black River LP—was for the same temporal term. This new agreement expressly superseded the prior agreement between TXU and the LLC (which had been assigned to the LP), and TXU agreed to pay $3,000,000 under the new agreement for the termination of the earlier agreements and "for the services provided under such prior agreements."

The new agreement made no mention of Wimberly and provided for 50% of Strebel's time to be devoted to TXU business. It also contained a term, as did the earlier TXU agreement, providing for a $3,000,000 payment from TXU upon to the sale of TXU to a third party.

### H. *2007's Income and Distributions*

TXU made both $3,000,000 payments in 2007—one triggered by termination of its earlier agreements with Black River LLC and one triggered by the sale of TXU to a third party. These payments contributed in large part to Black River LP's gross income of $8,821,029 in 2007. That same year, for the first time, bonuses were awarded to partners. Specifically, Black River LP awarded Strebel $3,000,000 in

---

1. Because Wimberly still held a 40% Sharing Ratio in Black River LLC's profits, and because Black River LLC—as the general partner—was entitled to 1% of Black River LP's profits, Wimberly's Sharing Ratio at the LP level of 24.63%, combined with his Share Ratio of 40% of the LLC's 1% interest, effectively allocated to him 25% of the TXU profits.

bonuses, as well as another $1,000,000 in bonuses to Houle and Manley.

Of the net income of $2,017.000 of the Black River LP and net income of $51,266 of Black River LLC, allocations of $539,148 to Wimberly were reported, but not paid to him, resulting in a tax liability to Wimberly of more than $200,000 on the undistributed allocation. After Wimberly filed a motion to in the district court to compel a distribution consistent with Black River LP's tax return allocations and his K–1, the LP revised its return to reflect Wimberly's distributions were zero.[2]

In January 2008, the trial court issued a temporary injunction prohibiting Strebel from causing or permitting the LLC or LP to reduce Wimberly's Sharing Ratio in any Black River entity below 25% of TXU's business. The court further ordered Strebel to cause the LLC or the LP to pay into the Court's registry "the equivalent of 25% of the TXU profits when compared to the other 75% of the TXU profits disbursed to any of the other partners for tax years 2007 or 2008." After that order and a subsequent sanctions order deeming the initial deposit inadequate, a total of $438,702 was deposited.

## THE PARTIES' CLAIMS

Wimberly's live pleading at the time of trial asserted claims for (1) Breach of Fiduciary Duty, (2) Unjust Enrichment, (3) Oppression of a Minority Member/Owner, (4) Defamation, and (5) Breach of Contract. He sought actual damages, exemplary damages, equitable relief and attorney's fees.

Strebel pleaded affirmative defenses of (1) Prior Breach, (2) Failure of Consideration, (3) Unclean Hands, (4) Parol Evi-

dence Rule, (5) Business Judgment Rule, (6) Waiver, and (7) Accord and Satisfaction. His answer also asserted that Wimberly lacked standing to bring some or all of his claims, and that the various terms of the Black River LLC Agreement and Black River LP Agreement barred his claims. Strebel further alleged that Wimberly's claims were defeated by Wimberly's own breaches of fiduciary duties to Strebel and by Wimberly's suing Strebel in the wrong capacity. Strebel counterclaimed for a Declaratory Judgment that Wimberly has "committed willful malfeasance, bad faith, and gross negligence in disregard of his obligations to the Companies; materially breached his obligations under the Agreements; and failed to cure such breach within thirty (30) days after receiving written notice of such breach." Strebel also sought attorney's fees.

## THE JURY TRIAL AND VERDICT

The case proceeded to a jury trial in September 2009. Wimberly's theory was that his work for TXU was above reproach, and that Strebel acted in bad faith—and contrary to his fiduciary duties—to deprive Wimberly of distributions by retroactively reducing his percentages and shifting money from profit to bonuses to reduce funds available for profit distributions. In response, Strebel argued that all his actions were taken in good faith, in furtherance of legitimate business interests, and that Wimberly was not pulling his own weight and was acting in bad faith by engaging in inappropriate conduct and working to advance endeavors outside the Black River entities. The jury returned a verdict in Wimberly's favor.

### A. Fiduciary Duties

2. Strebel testified at trial that his intent was to "provisionally allocate" income from the LP's and LLC's profit because at some point during the pendency of the underlying suit here, the LLC filed suit in Dallas to remove Wimberly "for cause" from the LLC and LP. No details about this suit or its outcome are found in the record of this proceeding.

The Court instructed the jury that Strebel owed a fiduciary duty to Wimberly:

> Because of the relationship of Douglas Strebel and John Wimberly as co-owners of Black River Capital, LLC with Douglas Strebel owning a majority share and exercising control over Black River Capital LLC as Managing Manager; and because of the relationship of Douglas Strebel and John Wimberly as partners in Black River Capital Partner, LP, Douglas Strebel owed John Wimberly a fiduciary duty of due care, good faith and loyalty in managing the business of the Black River Entities.

The jury then found that Strebel "fail[ed] to comply with his fiduciary duty," and awarded $2,748,925 for Wimberly's "Loss of Distribution Sustained in the Past."

### B. Oppression

The jury found in Wimberly's favor on his minority oppression theory and awarded $200,000 as compensation for oppression for "Loss of distributions sustained in the past."

### C. Exemplary Damages and Strebel's Counterclaims and Defenses

Because the jury's verdict was not unanimous, the jury did not reach the issue of exemplary damages. On Strebel's counterclaims and defenses, the jury failed to find that Wimberly "engaged in any bad faith in disregard of his material duties," or that Wimberly breached the Black River LLC Agreement or the Black River LP Agreement.

### THE JUDGMENT

The court entered judgment for Wimberly, awarding the $2,748,925 in actual damages found by the jury for breach of fiduciary duties plus prejudgement interest and costs. In addition, the court awarded Wimberly $400,000 for trial attorneys' fees, as well as conditional appellate attorneys' fees of $75,000 for an appeal to this Court and $50,000 for an appeal to the Supreme Court of Texas.

### THIS APPEAL

In seven issues, Strebel requests that the Court reverse the trial court's judgment and render judgment in his favor or, alternatively, reverse the trial court's judgment and remand the case for a new trial.

In his first issue, Strebel argues that the trial court erred by entering judgment in Wimberly's favor because (a) Strebel did not owe Wimberly any fiduciary duties at the LLC level and, in any event, Wimberly's "loss of distributions" stemming from any breach of fiduciary duty was at the LP—rather than the LLC—level, (b) Strebel did not owe a fiduciary duty to Wimberly at the LP level because, as a matter of law, limited partners in Texas do not owe fiduciary duties to other limited partners, and (c) Wimberly did not sue the LP's general partner, "which took the actions that allegedly caused Wimberly to lose distributions, and the trial court did not instruct the jury ... that Strebel, as the managing manager of the [LP]'s general partner, owned a fiduciary duty to Wimberly as a limited partner."

In his second issue, Strebel argues that the trial court erred by entering judgment for Wimberly because "(a) fiduciary duties do not create duties in derogation of the express terms of the parties' agreements, and (b) all of the acts that allegedly caused Wimberly to lose distributions were required or permitted by the terms of the parties'" LLC and LP agreements.

In his third issue, Strebel argues a new trial is required because "Wimberly's damages for lost distributions were based, in large part, on claims regarding alleged improper payments that Wimberly was re-

quired to bring derivatively" on behalf of the LP or LLC, rather than individually.

In his fourth issue, Strebel argues that the trial court's finding that "Strebel failed to comply with a fiduciary duty [is] immaterial because it seeks to impose fiduciary duties far broader than the parties' agreements allow, and does not take into account the controlling contractual provisions that limit Strebel's duties and liability to Wimberly." Alternatively, Strebel contends a new trial is required because the court "failed to submit a requested question on Strebel's affirmative defense based on the exculpation clause" in the parties' LP agreement.

In his fifth issue, Strebel argues that the trial court erred by "commingling invalid and arguably valid theories of liability" and that error was harmful because "It is not possible to tell the ground or grounds on which the jury found that Strebel 'failed to comply with his fiduciary duty."

In his sixth issue, Strebel argues that the evidence is legally or factually insufficient "to support the award of $2,748,925 in lost distributions when Wimberly's damages expert ignored the sharing ratios assigned to Wimberly and other limited partners, and made arbitrary adjustments to the companies' expenses and distributable profits."

In his seventh issue, Strebel argues that the trial court erred by awarding Wimberly attorneys' fees because "attorney's fees are not recoverable for breach of fiduciary duty claims, and Wimberly did not prevail on any claim for which attorney's fees are recoverable."

## ANALYSIS

### A. *Fiduciary Duties*

The Court instructed the jury that a fiduciary duty existed by virtue of two relationships between Strebel and Wim-

berly—their relationship at the LLC level (Strebel as Managing Member and Wimberly as a Member) and their relationship at the LP level (both as limited partners). Neither party argues that the question of whether a fiduciary duty existed was a question for the jury in this case. Rather, both parties appear to agree that it was a question for the court to decide as a matter of law. Specifically, they both agree that (1) whether Strebel owed Wimberly a fiduciary duty at the LLC level turns on interpretation of language in the Black River LLC agreement, and (2) whether Strebel owed Wimberly a fiduciary duty at the LP level turns on whether limited partners owe other limited partners fiduciary duties under Texas law.

### 1. Fiduciary duties related to Black River LLC

■ The Black River LLC Agreement is governed by Delaware law and thus governed by the Delaware Limited Liability Company Act. An express policy of the Act is "to give the maximum effect to the principle of freedom of contract and to enforceability of limited liability company agreements." Del.Code Ann. tit. 6, § 18–1101(b) (West 2010). Towards that end, it expressly provides that a member's or manager's duties—including fiduciary duties—to the LLC or other members or managers "may be expanded or restricted or eliminated by provisions in the limited liability company agreement," so long as it does not "eliminate the implied contractual covenant of good faith and fair dealing." Del.Code Ann. tit. 6, § 18–1101(c) (West 2010). Delaware courts have thus recognized that the existence and scope of any fiduciary duties of manager or members usually must be determined by reference to the specific LLC agreement. *See, e.g., Douzinas v. Am. Bureau of Shipping, Inc.,* 888 A.2d 1146, 1149–50 (Del.Ch.2006)

(recognizing that, because section 18–1101 permits contracting parties to expand or restrict fiduciary duties in LLC agreements, "it is frequently impossible to decide fiduciary duty claims without close examination and interpretation of the governing instrument of the entity giving rise to what would be, under default law, a fiduciary relationship.").

The Black River LLC Agreement states: Except as otherwise provided in this Agreement, the Managers shall have fiduciary duties to the Company and the Members equivalent to the fiduciary duties of directors of Delaware corporations.

[PX 2 at § 7.5(a).] The Delaware Supreme Court has characterized a "director's fiduciary duty to both the corporation and its shareholders" as that of "due care, good faith, and loyalty." *Malone v. Brincat,* 722 A.2d 5, 10 (Del.1998).

Strebel argues that because, under Delaware law, a director's fiduciary duty "runs to the corporation and to the entire body of shareholders generally, as opposed to *specific* shareholders," Strebel as the Managing Manager owed fiduciary duties to the LLC and its members collectively—not to Wimberly individually. It follows, according to Strebel, that the jury's finding Strebel breached his fiduciary duty under the LLC Agreement in response to "Question 1 cannot support a judgment for Wimberly."

In response, Wimberly points out that Strebel's proffered interpretation of the LLC agreement ignores the inclusion of "Members" in the clause providing that the "Managers shall have fiduciary duties to the Company *and the Members.*" Wimberly also notes that, absent an explicit contractual disclaimer disavowing the application of default principles, Delaware courts have treated "LLC members as owing each other the traditional fiduciary duties that directors owe a corporation." He urges us to conclude that Strebel's interpretation of the agreement to provide that fiduciary duties run to Members only collectively rather than individually is "illogical ([as] it is undisputed that Wimberly was the only other Member) and contrary to the plain language of Section 7.5(a), and it confuses to whom Strebel owed a duty (*i.e.,* the Members") with the nature and scope of that duty (i.e., equivalent to that owed by corporate directors)."

■ We agree with Wimberly. Under both Texas and Delaware law, contracts should be read as a whole, with terms given their plain, ordinary, and generally accepted meaning, and with each term given effect so as not to render recitations meaningless or mere surplusage. *E.g., Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 662 (Tex.2005); *Osborn v. Kemp,* 991 A.2d 1153, 1159 (Del.2010). Applying these principles, we recently rejected an argument similar to that made by Strebel here. In *Allen v. Devon Energy Holdings, L.L.C.,* we interpreted a clause in a Texas LLC agreement recognizing a manager's liability for breach of his "duty of loyalty *to the company or its members* " to include fiduciary obligations to both the company and its individual members. 367 S.W.3d 355, 396–97 & n. 58 (Tex.App.-Houston [1st Dist.] 2011, no pet. h.) (emphasis added). Insisting that he could not be liable to an individual member of the LLC, the manager in *Allen* argued "that the phrase 'or its members' refers to the owners collectively, and therefore is only describing the duty to the limited liability company itself." *Id.* at 397 n. 58. We rejected that argument, noting that this "interpretation makes this phrase superfluous because the duty to the corporation is stated in the same sentence." *Id.*

In this case, we hold that the trial court correctly interpreted the Black River LLC Agreement as imposing upon Strebel, as a Managing Manager, duties of due care, good faith, and loyalty to Wimberly as an individual Member. We read the LLC's Agreement reference to the Manager's duties being "equivalent to the fiduciary duties of directors of Delaware corporations" not to limit *to whom the duties are owed*, but instead to identify the *type of duty*, i.e., due care, good faith and loyalty. The earlier part of the clause—i.e., "the Managers shall have fiduciary duties *to the Company and the Members*" (emphasis added)—identifies to whom the duties are owed. To interpret it otherwise would give no meaning to the word "Members." The trial court thus did not err in instructing the jury in Question No. 1 that Strebel owed a fiduciary duty to Wimberly as the Managing Manager of the Black River LLC.

### 2. Fiduciary duties related to Black River LP

■ The Black River LP Agreement was entered pursuant to the Texas Revised Limited Partner Act (TRLPA) and is governed by Texas law. The agreement is silent as to any fiduciary duties owed between and among the limited partners—i.e., Strebel, Wimberly, Manley, and Lee. In Question No. 1, the trial court instructed the jury that "because of the relationship of Douglas Strebel and John Wimberly as partners in Black River Capital Partner, LP," Strebel owed to Wimberly a fiduciary duty.

Strebel argues that this instruction was erroneous because, under Texas law, "a person's mere status as a limited partner is insufficient to create fiduciary duties,"

and the LP agreement expressly disclaims any fiduciary duty owed by the general partner. In support, he cites two unpublished cases—*Crawford v. Ancira*, No. 04–96–00078–CV, 1997 WL 214835, at *5 (Tex. App.-San Antonio, April 30, 1997, no writ) (not designated for publication) and *AON Props. Inc. v. Riveraine Corp.*, No. 14–96–00229–CV, 1999 WL 12739, at *23 (Tex. App.-Houston [14th Dist.] Jan. 14, 1999, no pet.) (not designated for publication)—and an article positing that limited partners should not owe fiduciary duties because they are passive investors. Miller, *Fiduciary Duties, Exculpation, and Indemnification in Texas Business Organizations*, at 11–12, 15–16, *in* STATE BAR OF TEX. PROF. DEV. PROGRAM, ESSENTIALS OF BUSINESS LAW COURSE (2010).

Strebel also argues that, because a shareholder in a closely held corporation does not "as a matter of law owe a fiduciary duties to his co-shareholder[s], . . . it follows with even more force that limited partners in a Texas limited partnership do not as a matter of law owe fiduciary duties to each other." For these reasons, Strebel argues that his relationship with Wimberly as a limited partner cannot support the jury's finding of a breach of fiduciary duty.

Wimberly disagrees, noting that the TRLPA, which Strebel agrees governs, provides that "[i]n any case not provided for by this Act," the Texas Revised Partnership Act (TRPA) "and the rules of law and equity" govern. TEX.REV.CIV. STAT. ANN. art. 6132a–1 § 13.03(a)(c) (Vernon 2002).[3] Because TRLPA contains no provisions about duties owed by limited partners to each other, Wimberly argues that the "TRPA therefore determines what fiduciary duty Strebel owed Wimberly," and

---

**3.** Act of May 31, 1993, 73d Leg., R.S., ch. 917m § 8, 1993 Tex. Gen. Laws 3887, 3914 (expired Jan. 1,2010).

it expressly provides that "[a] partner owes to the partnership and the other partners: (1) a duty of loyalty; and (2) a duty of care." Tex.Rev.Civ. Stat. Ann. art. 6132b–4.04(a) (Vernon 2002 & Supp. 2010).[4]

Finally, Wimberly notes that that Strebel relies only on two non-precedential, unpublished cases that are distinguishable on their facts and that do not cite or acknowledge—much less explain—why the express duties provided for by the TRPA do not apply through the TRLPA. Wimberly also points out that both the Fifth Circuit and the Texarkana Court of Appeals have, in more recently decided cases, expressly recognized that fiduciary obligations exist between limited partners. *See McBeth v. Carpenter,* 565 F.3d 171, 177 (5th Cir.2009) ("With respect to fiduciary duties owed by . . . [defendant] limited partners to the Plaintiffs, Texas law recognizes such obligations between limited partners, applying the same partnership principles that govern the relationship between a general partner and limited partners."); *Zinda v. McCann St., Ltd.,* 178 S.W.3d 883, 890–91 (Tex.App.-Texarkana 2005, pet. denied) (recognizing limited partners owe fiduciary duties to one another, including the duty to fully disclose all matters affecting the partnership and account for all profits and property, as well as a strict duty of good faith and candor).

■ As a recent commentator aptly observed, the relevant question is more nuanced than simply whether limited partners, as a matter of law, do or do not owe fiduciary duties to other limited partners. *See* Colin P. Marks, *Limited Partnership Status and the Imposition of Fiduciary Duties in Texas,* 63 Baylor L.Rev. 126, 132 (2010). A look at the facts presented in these seemingly conflicting cases · demonstrates that they are reconcilable with the rule that status as a passive investor does not give rise to fiduciary duties, but that a party's status as a limited partner does not insulate that party from the imposition of fiduciary duties that arise when a limited partner also takes on a nonpassive role by exercising control over the partnership in a way that justifies the recognition of such duties or by contract. *See id.* at \*128 ("[T]hough Texas jurisprudence has failed to articulate a clear rule, it is consistent with · the cases decided thus far and the nature of a limited partnership to only create a fiduciary duty in certain equitable circumstances, such as when the limited partner is exercising control over the limited partnership or is also acting in the role of general partner."). When a person serves in a dual capacity as a limited partner and as a person controlling or managing the affairs of a limited partnership, it is not the party's status as a limited partner that gives rise to fiduciary duties; rather those duties exist by virtue of the additional relationship, such as agent or employee, in which capacity that person controls or manages the business of the partnership or by contract.

■ In *Crawford v. Ancira,* the first case Strebel cites, a limited partner plaintiff brought fraud claims against another limited partner in an attempt to avoid certain contractual obligations, claiming that limited partner had made misrepresentations to her that were contrary to the contractual terms. 1997 WL 214835, at \*4. Recognizing that the plaintiff's fraud claim was only viable if a fiduciary or confidential relationship existed between the parties, the San Antonio Court of Appeals

4. Act of May 20, 2003, 78th Leg., R.S. ch. 572, § 20, 2003 Tex. Gen. Laws 1934, 1941 (expired Jan. 1, 2010).

rejected her claim. *Id.* The court reasoned that limited partners do not have the broad managerial powers enjoyed by general partners and, thus, "a person's mere status as a limited partner is insufficient to create fiduciary duties." *Id.* at *5. Notably, the defendant in *Crawford* was not also the general partner, nor was there any indication that the defendant exercised any management or control over the limited partnership affairs.

The second case Strebel cites, *AON Properties v. Riveraine Corporation,* involved a suit by one limited partner against another limited partner for breach of fiduciary duty, complaining about the defendant limited partner's actions in (1) voting down an agreement to sell the limited partnership to a third party, and (2) voting to remove a corporation as general partner after that corporation lost its charter. 1999 WL 12739, at *1, *23. The trial court instructed the jury that the limited partners "owe[d] each other fiduciary duties as a matter of law." *Id.* at *7. On appeal, the Fourteenth Court of Appeals in Houston held that this instruction was erroneous, relying on cases from other jurisdictions holding that "a limited partner does not owe a fiduciary duty *unless it actively engages in control over the operation of the business so as to create duties that otherwise would not exist.*" *Id.* at *23 (emphasis added). Because the TRLPA provisions applicable at the time provided that "a limited partner does not participate in the control of the business" by voting on the sale of "an asset or assets of the limited partnership" or by voting on the "admission, removal or retention of the general partner," the court concluded that the actions complained of by the plaintiff did not amount to the types of control that could given rise to a duty to the other limited partners. Thus, consistent with *Crawford,* the *AON Properties* court looked to the issue of management and

control by the limited partner in assessing what duty, if any, existed.

In support of his argument that limited partners do owe each other fiduciary duties, Wimberly cites *Zinda v. McCann Street, Ltd.,* a case in which one limited partner sued a general partner and other limited partners for breach of fiduciary duty. 178 S.W.3d at 890. The jury returned a verdict in favor of the general partner and the two limited partners that owned the general partner. *Id.* On appeal, the Texarkana Court of Appeals made no distinction between the general partner defendant and the two limited partner defendants in observing that the "relationship among the various parties was a partnership; thus the [defendants] owed fiduciary duties to" the plaintiff. *Id.* at 890. The court concluded, however, that the evidence supported the jury's finding that no duties had been breached, rendering its broad pronouncement about the relationships giving rise to the fiduciary duties dicta. *Id.* While not part of the *Zinda* court's analysis, it is noteworthy that the limited partners at issue there also controlled the general partner. It was thus not their status as limited partners but, rather, their operating control over the partnership through the general partner that could give rise to fiduciary duties. *Id.*

Finally, Wimberly cites *McBeth v. Carpenter,* a Fifth Circuit case in which the court, "[a]fter careful review of the record and Texas law," affirmed a judgment against limited partners for breaching fiduciary duties to other limited partners. 565 F.3d at 177. McBeth and Reynold, the limited partner plaintiffs in *McBeth,* obtained a verdict against three parties: James Carpenter, Texas Water Solutions (TWS) and Texas Water Management (TWM). *Id.* at 174. TWS and TWM were limited partners. *Id.* at 174–75. Both

TWS and TWM were entities controlled by Carpenter, and Carpenter further controlled the general partnership entity (not a party to the suit). *Id.* On appeal, in discussing Texas law the court did not distinguish between the fiduciary obligations of general partners ·and limited partners. *Id.* at 177–78. The court did, however, explain why—on the facts presented—*Crawford* and *AON Properties* would not compel a different result even if they had precedential value:

> [TWS] and [TWM] maintain that limited partners owe no fiduciary duties to one another, citing two unpublished Texas cases. . . . [E]ven a review of these cases reveals that they do not stand for the proposition urged by [TWS] and [TWM]. *AON Properties* sets forth that even where no fiduciary duties normally arise, they spring into existence when a limited partner "actively engages in control over the operation of the business so as to create duties that otherwise would not exist." *AON Props.*, 1999 WL 12739, at *23. Carpenter controlled both [TWS] and [TWM] and the evidence at trial showed that it was often unclear on whose behalf Carpenter was acting in exercising control over [the limited partnership]. Therefore, even accepting the argument that fiduciary duties would not normally arise between limited partners, even *AON Properties* militates the opposite conclusion due to the relationship between these parties.

565 F.3d at 178 n. 1. In response to TWS's and TWM's argument that there was no evidence that TWS and TWM exerted any control, the court noted that while the "limited partnership agreement itself specifically stated that the general partner retained exclusive control and management over the partnership," at trial "extensive testimony established that Carpenter was 'the man in control'" and there was "evidence that Carpenter exerted control over [the limited partnership] not just as general partner . . . but also in his capacity as President of both" TWS and TWM. *Id.* at 178.

We reconcile these cases by holding that status as a limited partner alone does not give rise to a fiduciary duty to other limited partners. That is not to say, however, that a party who is a limited partner does not owe fiduciary duties to other limited partners when that party, wearing a different hat, exerts operating control over the affairs of the limited partnership. For example, when a limited partner also serves as an officer of the limited partnership, as in *McBeth*, that partner may owe fiduciary duties based on his agency relationship to the partnership and the other limited partners, without regard for his limited partner role. The existence and scope of that duty will be defined not by the law governing limited partners, but rather by the relevant laws and contracts governing the role under which the party is exercising the authority.

In this case, Strebel complains about the trial court's instruction to the jury that "because of the relationship of Douglas Strebel and John Wimberly as partners in Black River Capital Partners LP," Strebel owed Wimberly "a fiduciary duty of due care, good faith, and loyalty in managing the business of the Black River Entities." The relationship between Strebel and Wimberly as limited partners in Black River Capital Partners LP did not give rise to a direct fiduciary duty to each other. And, as explained further below, to the extent that the instruction conveys that Strebel owed a fiduciary duty to limited partners in his capacity as Managing Manager of the LLC that that serves at the GP of the LP, the LP agreement expressly disclaimed any fiduciary duty owed to the limited partners by the general partner itself. The trial court's instruction fails to

account for the legal effect of this disclaimer.

### 3. The trial court commingled valid and invalid theories in Question No. 1.

A trial court errs by submitting to the jury theories of liability that are not legally viable—e.g., liability theories that have not been pleaded, are not supported by the legally sufficient evidence, or are not supported by operative law. *See* Tex.R. Civ. P. 277; *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex.2000) (stating that Rule 277 implicitly mandates that the jury be able to base its verdict on legally valid questions and instructions); *see also Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 215 (Tex.2005) ("[B]road-form submission cannot be used to put before the jury issues that have no basis in the law or the evidence.").

Strebel argues that the trial court committed harmful error by commingling valid and invalid theories in Question No. 1. We agree. The broad form question instructed the jury that Strebel owed Wimberly a fiduciary duty at the LLC level, which is correct, and at the LP level, which is not. It is thus impossible to determine whether the jury's affirmative finding of a breach of fiduciary duty in response to Question No. 1 is based on a valid or invalid theory. *Casteel*, 22 S.W.3d at 389–90. We accordingly sustain Strebel's fifth issue that the trial court improperly commingled valid and invalid theories in Question No. 1.

Generally, such commingling error mandates a new trial rather than rendition in the appellant's favor. *See id.; Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 122 (Tex.App.-Houston [1st Dist.] 2011, no pet.). But here Strebel argues that he is entitled to rendition because—even if he owed Wimberly fiduciary duties at the LLC or LP level as instructed in Question No. 1—"Wimberly did not sue the [LP]'s general partner, which took the actions that allegedly caused Wimberly to lose distributions, and the trial court did not instruct the jury in Question No. 1 that Strebel, as the managing manager of the [LP]'s general partner, owed a fiduciary duty to Wimberly as a limited partner." Because, as explained below, we agree that Wimberly's recovery under Question No. 1 fails on causation grounds, we reverse and render judgment on Wimberly's fiduciary duty claims.

### B. *Causation*

In addition to demonstrating duty, to recover on a breach of fiduciary duty claim, the plaintiff must also prove breach of that duty, causation and damages. *Las Colinas Obstetrics–Gynecology–Infertility Ass'n v. Villalba*, 324 S.W.3d 634, 645 (Tex.App.-Dallas 2010, no pet.) (citing *Abetter Trucking Co., Inc. v. Arizpe*, 113 S.W.3d 503, 508 (Tex.App.-Houston [1st Dist.] 2003, no pet.)); *Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex.App.-Dallas 2010, no pet.).

Strebel asserts that, even if he owed Wimberly the fiduciaries duties charged by the court, he did not breach those duties because the damages alleged by Wimberly and found by the jury were not caused by him acting in "the two 'horizontal' relationships defined in Question No. 1 (*i.e.*, the co-owner and the limited partner relationships)." Rather, he contends that "Wimberly's complaints regarding lost distributions were primarily aimed in a 'vertical' direction—*i.e.*, to the actions and decisions of the LP's general partner (i.e., the LLC) in exercising its exclusive authority to run the LP and Strebel's alleged control of the general partner." Both because there is an express contractual disclaimer in the Black River LP agreement of fiduciary duties owed by the general partner to the

limited partner and because there was no jury question about breaches of any duty by the general partner, Strebel argues that Wimberly has failed to establish the breach of the duties found by the Jury in response to Jury Question No. 1 caused his damages.

Wimberly responds that Strebel's argument "disregards the fact that the Black River entities were created together with the intention that they be operated as one business; with Strebel, as Managing Manager of Black River LLC, ultimately in control of all; subject to the limitations imposed upon his exercise of such power." Further, Wimberly asserts, Strebel ignores that the Black River LLC agreement "expressly: (a) defines Major Decisions to include his 'causing' Black River LLC to take any action 'in its capacity as partner, Manager, ... or owner ... of any Subsidiary or Affiliate;' and (b) makes limitations upon his power as Managing Manager, including his fiduciary duty to Wimberly, applicable to '[a]ny action or decision [by him], directly or indirectly in the name of the Company or otherwise, with respect to any Subsidiary or Affiliate of the Company ... as if such action or decision were directly taken by the Company.' "

As we have explained, the trial court correctly determined that Strebel owed contractual fiduciary duties to Wimberly as a Member of the LLC. The Black River LP Agreement, however, expressly disclaims any fiduciary duty owed by the general partner that Strebel controlled, i.e., Black River LLC, to Wimberly as a limited partner:

> The General Partner shall have no duties (including fiduciary duties) except as expressly set forth in this Agreement.

Thus, we must determine in which capacity Strebel was functioning when performing the specific actions that Wimberly claims gave rise to damages for breach of fiduciary duty. For the reasons set forth below, we conclude Wimberly's claims relate to actions taken by Strebel as the controlling manager of the general partner (i.e., Black River, LLC) against Wimberly as a limited partner in Black River LP while operating under the LP agreement. The contractual disclaimer of fiduciary duties in the Black River LP Agreement thus forecloses Wimberly's recovery on his breach of fiduciary duty claim.

Wimberly was awarded damages for "Loss of Distribution[s] sustained in the past" that "were proximately caused by Douglas Strebel's failure to comply with his fiduciary duties to John Wimberly." These past distributions primarily relate to profits from the TXU Agreement. When the Black River Amended LLC Agreement and the Black River LP Agreement were executed on December 8, 2005, they provided that all of Black River LLC's assets—including the TXU Agreement—were assigned from Black River LLC to Black River LP as of August 12, 2005. After that time, all the TXU and other business was conducted through the LP rather than the LLC. To ascertain whether the LLC or the LP agreement governed the relevant obligations and duties between Strebel and Wimberly, we thus look to the specific complaints and their timing.

In his brief, Wimberly complains that *after* "the several agreements were executed on December 8, 2005, Strebel exploited his control over Black River LLC as Managing Manager (and through Black River LLC over Black River LP), to systematically take actions that were designed to and did improperly reduce Wimberly's profit distributions." Specifically, he complains that

(1) "[I]n December of 2005, Strebel allocated $1,065,769 that Black River LLC had already earned that year

from TXU from Black River LLC (where Wimberly's share was 40%) to Black River LP (where Wimberly's share was 34.63 in TXU business."

(2) "In 2006, the Black River LLC advisory business generated profits of approximately $5,400,000. However, Strebel distributed only $1,244,674—or 23% of these profits to Wimberly; far less than the 40% share of all profits Wimberly was entitled to under the Amended LLC Agreement and far less than the 34.63% of TXU profits Wimberly was entitled to under the LP Agreement."

(3) "Strebel unilaterally announced, in a November 2006 email, that '[e]ffective 1/1/06 your sharing ratio in TXU business will be 25%.' "

(4) "Strebel used his control over the books and records to record various personal expenses that he had caused the Black River entities to pay on his behalf not as compensation to himself but as business costs that reduced the profits available to be distributed."

(5) On February 18, 2007, "Strebel used his power as the Managing Manager of Black River LLC to demand a $500,000 Capital Contribution from Wimberly."

(6) In 2007, "Strebel secretly renegotiated the terms of the engagement with TXU, without informing Wimberly or the other managers, in an effort to deprive Wimberly of profit distributions."

(7) In 2007, Strebel awarded himself two 'bonuses' totaling $3,000,000 (20 times his annual salary) and awarded two close friends who were also

minor limited partners in Black River LP close to $1,000,000 in bonuses."

As Wimberly acknowledges, all business was conducted at the Black River LP level after the December 2005 agreements were executed. Thus, the parties at that point were operating under the Black River LP Agreement, and each of these acts Wimberly complains of relate to Black River LP business and Black River LP revenue and profits.[5] Moreover, Strebel's actions were necessarily taken on behalf of the general partner of the LP, as the general partner was the only one empowered to make decisions about allocations, profit distributions, sharing ratios, business expense allocations, TXU negotiations, and the award of bonuses.

While courts have recognized that general partners in a limited partnership owe fiduciary duties to the limited partners, e.g., *Graham Mortg. Corp.*, 307 S.W.3d at 479, the supreme court has emphasized the importance of honoring parties' contractual terms defining the scope of their obligations and agreements, including limiting fiduciary duties that might otherwise exist. E.g., *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 703 (Tex. 2007) (recognizing parties' agreement to limit the fiduciary duties that would otherwise exist between agent and principal). This is especially true in arms-length business transactions in which the parties are sophisticated businessmen represented by counsel, as the parties were here. *Id.*

When Strebel and Wimberly first began their consulting work, Strebel clearly owed Wimberly fiduciary duties that were expressly provided for in their LLC Agreement. But later the parties—after much

---

**5.** The exception is the $500,000 Capital Call, which was made by Black River LLC. That call, however, was enjoined by the trial court, so even assuming it could amount to a breach of fiduciary duty, it did not contribute to any damages.

negotiation and while represented by counsel—entered into a limited partnership agreement expressly providing that all the assets of their LLC would be transferred to the LP, and that the Strebel-controlled general partner would owe *no fiduciary duties* to the limited partners, including Wimberly. Because Strebel's actions that Wimberly complains of were all taken in his capacity as Managing Manager of the general partner, we hold that the waiver of fiduciary duties in the Black River LP Agreement forecloses those claims. *E.g., Jochec v. Clayburne*, 863 S.W.2d 516, 520 (Tex.App.-Austin 1993, writ denied) (holding trial court erred by refusing to recognize that trustee's fiduciary duties had been contractually limited); *Kline v. O'Quinn*, 874 S.W.2d 776, 787 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (holding that contract between lawyers defined scope of their duties to each other, and refusing to impose fiduciary duties in addition to the duties expressly provided for in contract).

Wimberly urges us to view Strebel's actions as encompassed by the fiduciary duty Strebel owed to Wimberly at the LLC level because Strebel "caused" the LLC—as the general partner of the limited partnership—to perform the acts Wimberly complains about. Adopting this reasoning, however, would render meaningless the express disclaimer of fiduciary duties in the limited partnership agreement under which that the parties were operating. And such reasoning ignores that Wimberly necessarily suffered his injury and damages as a limited partner of the LP, not as a member of the LLC parent, as the contracts that produced the revenues that he complains should have been distributed to him were held at the limited partnership level.

In sum, we agree with Strebel that Wimberly failed to demonstrate that Strebel took actions that caused his lost-distribution damages while acting within the scope of any fiduciary relationship that existed between the parties. The actions Wimberly complains about causing his lost-distribution damages instead were taken by the Strebel-controlled general partner of the LP and, thus, cannot form the basis of a breach of fiduciary duty claim where those fiduciary duties have been expressly disclaimed.

For all of these reasons, we sustain Strebel's first issue and hold the trial court erred by entering judgment on the jury's breach of fiduciary duty finding.

## C. Attorneys' Fee Award

Without specifying a basis for the award, the trial court's judgment awards to Wimberly $400,000 in trial attorneys' fees, as well as conditional attorneys' fees for an appeal. In his seventh issue, Strebel urges us to reverse the attorneys' fees award because, he argues, "Wimberly did not prevail on any claim for which attorney's fees are recoverable." *See Spangler v. Jones*, 861 S.W.2d 392, 397 (Tex.App.-Dallas 1993, writ denied) ("To obtain attorney's fees, a party must prevail on a claim for which attorney's fees are recoverable."). Wimberly counters that the Texas Supreme Court has recognized that any claim can support attorneys' fees under section 38.001(8) of the Civil Practice and Remedies Code when the claim enforces "a part of the basis of a bargain and is contractual in nature." *Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 58–61 (Tex.2008). We need not address the merits of these arguments because our reversal of the trial court's award of actual damages requires us to reverse the trial court's award of attorneys' fees. *E.g., Barker v. Eckman*, 213 S.W.3d 306, 315 (Tex.2006). We thus sustain Strebel's seventh issue.

## D. Other Issues

Our sustaining Strebel's first, fifth, and seventh issues is dispositive of this appeal. We thus need not reach his second, third, fourth, and sixth issues.

### E. Remand for Consideration of Other Claims

■ Although the trial court entered judgment on the jury's breach of fiduciary duty findings, the jury also found in Wimberly's favor in response to four minority oppression questions and awarded him $200,000 in damages. When, as here, "a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief." *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex.1988). "[A]n election by the prevailing party is not necessary," and that "party may seek recovery under an alternative theory if the judgment is reversed on appeal." *Id.*

Because we have reversed the trial court's judgment on the jury's breach of fiduciary duty finding, Wimberly may be entitled to seek judgment on his alternative oppression theory. We thus remand to the trial court for consideration of the jury's alternative findings.

### CONCLUSION

We reverse the trial court's judgment and remand for further proceedings consistent with this opinion.